*STATE OF MARYLAND V. KEVIN ARMSTEAD*
Case No. 1148, September Term, 2016, Argued, 11/13/2017

**HEADNOTES**

**POST CONVICTION – INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL –
FAILING TO OBJECT TO CSI *VOIR DIRE* QUESTION**

We decline Armstead's invitation to apply retrospectively *Allen v. State*, 204 Md. App.
701, 42 A.3d 708 (2012) to our analysis in this case of Armstead's trial counsel's 2009
performance. We held in *Allen* that *Stabb v. State*, 423 Md. 454, 31 A.3d 922 (2011), and
*Atkins v. State*, 421 Md. 434, 26 A.3d 979 (2011), applied to all cases then pending on
direct appeal in which the issue of a CSI effect jury instruction was preserved. Here, a
post-conviction court granted Armstead's petition for a new trial. Armstead's trial counsel
failed to object to the CSI effect *voir dire* question at issue, failing ultimately to preserve
it for our review. Armstead's trial counsel was not ineffective for failing to object to the
trial judge's use of a CSI *voir dire* question on 25 March 2009, however. Trial counsel
may be imputed reasonably to know at that time only of *Evans v. State*, 174 Md. App. 549,
922 A.2d 620 (2007), discussing a defense counsel's objection to a CSI effect *jury
instruction*, which instruction was found to be proper. It is not reasonable to expect trial
counsel to foresee the change in the law that took place after Armstead's trial when the
Court of Appeals decided *Charles & Drake v. State*, 414 Md. 726, 733, 997 A.2d 154, 158
(2010), in which the impermissible nature of this particular CSI effect *voir dire* question
was explicated. Armstead failed to meet his burden under *Strickland v. Washington*, 466
U.S. 668, 104 S. Ct. 2052 (1984), presenting no evidence establishing that the prevailing
professional norm at the time of his trial was to object to CSI effect messages to the venire.

**POST CONVICTION – INEFFECTIVE ASSISTANCE OF COUNSEL – FAILING
TO OBJECT TO CSI *VOIR DIRE* QUESTION – PREJUDICE – HARMLESS
ERROR**

Even if it were assumed Armstead's trial counsel's omission constituted constitutionally
ineffective representation, the claimed error was harmless, beyond a reasonable doubt,
under the circumstances of this record, thus leaving unsatisfied *Strickland's* prejudice
requirement. Neither the trial court nor the parties' counsels repeated the anti-CSI effect
message during the trial. The trial judge administered jury instructions at the close of the
evidence, reasserting the State's burden of proof. Counsel were allowed amplitude in
arguing their positions as to the adequacy or inadequacy of the evidence (scientific or
otherwise) linking Armstead to the crimes. An eyewitness placed Armstead at the murder
victim's home at the time of the murder. In addition, Armstead made a voluntary
incriminating statement to Detective James Lloyd during Armstead's post-arrest
interrogation. Thus, the absence of DNA evidence in the State's case linking Armstead to

the murder of the victim was not of critical importance to the State's case proving, beyond a reasonable doubt, Armstead's participation in the crime. Armstead's claims regarding the assumedly erroneous CSI effect *voir dire* question did not cause impermissibly the guilty verdict.

Circuit Court for Baltimore City
Case No. 108113001-02

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1148

September Term, 2016

_____

STATE OF MARYLAND

v.

KEVIN ARMSTEAD

_____

Kehoe,
Nazarian,
Harrell, Glenn T., Jr.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Harrell, J.
_____

Filed: February 1, 2018

"Ninety-nine bottles of beer on the wall,
Ninety-nine bottles of beer.
You swab one down and run it through CODIS,
Ninety-eight bottles of beer on the wall."

Lines spoken by the character Greg Sanders on "CSI" Season 3, Episode 19 "A Night at the Movies" (CBS-TV. Episode aired 10 April 2003)

At the core of this post-conviction case is the rectitude of the failure of trial counsel for Appellee, Kevin Armstead, to object to a so-called "anti-CSI effect"[1] *voir dire* question propounded on 25 March 2009 to the venire by a trial judge of the Circuit Court for Baltimore City. Armstead contends that that failure amounts to ineffective assistance of trial counsel because he would have had a reasonable probability of success on direct appeal had a challenge to the propriety of the *voir dire* question been preserved. The circuit court granted Armstead a new trial in 2016 in this post-conviction proceeding, which Armstead initiated in 2014.

Appellant, the State of Maryland, complains that the award of a new trial is inappropriate because, on 25 March 2009, Maryland common law (such as it was) approved of such a CSI question. Mistakenly, according to the State, the 2016 post-conviction court relied on contrary, subsequently-decided case law to justify ordering a retrial. The State maintains that Armstead's trial counsel was not obligated in 2009 to "see into the future" and anticipate the outcomes in the later-decided cases. Moreover,

---

[1] This question will be referred sometimes hereafter either as a "CSI *voir dire* question," "CSI effect *voir dire* question," or as "anti-CSI effect *voir dire* question." "CSI" stands for Crime Scene Investigation. *See Atkins v. State*, 421 Md. 434, 456, 26 A.3d 979, 991 (2011) (Harrell, J. concurring).

Armstead "did not call his trial defense counsel, or any other attorney, as a witness [in the post-conviction phase] to testify concerning the propriety of trial counsel's deliberate [trial strategy] decision not to object to the *voir dire* question." Thus, "there is no basis in which the post-conviction court could conclude that Armstead's [t]rial counsel was ineffective as alleged." Armstead failed, therefore, to satisfy his burden under the factors in *Strickland v. Washington*[2] to prove ineffective assistance of counsel. The State argued also that Armstead failed to demonstrate satisfactorily how he was prejudiced by the lack of an objection, the second factor in the *Strickland* analysis.

In this appeal, Appellant poses one question:

I. Did the post-conviction court err when it determined, based on case law that issued after Armstead's trial, that Armstead's trial counsel was ineffective for failing to object to the circuit court's issuance of a CSI *voir dire* question?

We hold that the post-conviction court erred when it granted Armstead's petition and ordered a new trial. Armstead's trial counsel was not ineffective for failing to object to the CSI *voir dire* question. Even if we assumed his trial counsel's omission constituted ineffective representation, the claimed error was harmless, beyond a reasonable doubt, on the circumstances of this record.

**Statement of Facts**

We, like the post-conviction court, adopt in relevant part the summary of the evidence presented at Armstead's 2009 trial, as stated in our opinion regarding Armstead's

---

[2] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

direct appeal, *Armstead v. State*, 195 Md. App. 599, 605-9 7 A.3d 169, 172-5 (2010), *cert. denied*, 418 Md. 191, 13 A.3d 798 (2011):

On [20 March 2007], Ricardo Paige was found lying dead on the living room floor of his residence at 502 East 43rd Street in Baltimore City, Maryland, having suffered multiple gun shot wounds. He was discovered by his daughter, Deneen Woods, and his grandson, Ricardo McDonald.

Woods testified at trial that she had seen [Armstead], also known as "Muggs," on the block on prior occasions with [Jamal] Fulton, who she knew as "Nube," and with Trendon and Tremaine Washington, twin brothers, both of whom she knew as "Twin." Fulton lived in the house next door, 500 East 43rd Street. Drugs were a "big problem" with Fulton. On the Friday before Woods's father was murdered, Fulton came to 502 East 43rd Street and argued with Paige. Fulton told Woods that her father was "making his spot hot." Woods responded by telling Fulton that she did not want any drugs to be around her father, and Fulton replied that "he would not say nothing else to [her] dad."

At some point after Paige's death, Woods spoke to a person in the neighborhood she knew as "Lurch." Lurch provided Woods with some information, and Woods conveyed that information to Detective James Lloyd.

Leroy Simon testified that he is known as "Lurch" and that he knew Paige through Woods. In late March 2007, intending to exchange drugs for sex, he was with a woman behind the victim's residence. At that time, he saw [Armstead], Fulton, known to him as "Nuke," and "Twin" and another unidentified individual near Paige's house.

He observed [Armstead] go into Paige's house first, and then he heard some "tussling." A few minutes later, he saw "Twin" enter the house. Fulton went inside the residence as well. The unidentified person remained outside the residence where he was giving orders.

After [Armstead], Fulton, and "Twin" were inside, Simon heard gunshots. He then heard sounds as if someone was sweeping up some glass and then saw the trio emerge from the residence.

Simon knew both Tremaine and Trendon Washington, and was aware that one of them was incarcerated at the time. He identified a photograph of Trendon Washington as the person he was referring to as "Twin" in his testimony.

After Simon testified that he spoke to Detective Lloyd on three occasions, the State sought to refresh his recollection with a statement, but Simon testified that he could not read or write. Because there was some confusion about whether Simon ever told police that he saw Fulton enter the

3

residence, the jury was excused, and the tape of Simon's third interview was played to refresh Simon's recollection.

After the jury returned, Simon testified that Fulton was standing outside of the house and actually never went inside. Simon admitted he had made a mistake earlier during his testimony when he said Fulton had gone inside.

Simon continued his testimony as follows: While [Armstead], "Twin" (Trendon Washington), and an unidentified third person were inside the residence, Simon heard tussling. After he heard these sounds, Fulton, "who remained outside, hollered, 'handle your business.'" Simon then heard two to three gunshots. After the shooting, Simon saw all four individuals run from the residence.

*Simon identified a photo of [Armstead] as a person who was present at the crime scene and had entered the residence.* He also identified both Tremaine and Trendon Washington, distinguishing between them and identifying Trendon Washington as the twin present at the scene. Simon was originally unable to identify the person who remained outside the residence, but, after refreshing his recollection, recalled that during the third interview with police, he identified a photograph of Fulton, indicating that he was the one who stayed outside and "gave orders."

Asked why he did not go to the police earlier, Simon stated: "It ain't good to snitch, it ain't good to snitch. Snitchers get stitches, that's how I always looked at it." However, when he learned that the victim was Wood[s]'s father, Simon decided to come forward. He learned two days after he saw the individuals at Paige's residence that Paige had died.

On cross-examination, Simon testified that he had not testified in the trial involving Trendon Washington and that he was incarcerated when he first spoke to Detective Lloyd about this case.

Detective Chris Glanville testified that he encountered [Armstead], and both Trendon and Tremaine Washington, on [28 April 2007]. At that time, he recovered a loaded .45 caliber Springfield nineteen eleven model firearm from Trendon Washington. All of the bullets recovered in this case were .45 auto caliber. The ballistics evidence was compared to the recovered firearm, and two of the cartridge casings recovered from the crime scene were fired from that pistol. Other bullet specimens could neither be identified nor eliminated as being fired from the recovered gun. However, three of the five bullets recovered in this case were fired by the same firearm, while the two remaining bullets lacked proper markings for comparison.

Detective Lloyd testified that Trendon Washington, Fulton, and [Armstead] were arrested in connection with this case. [Armstead] was arrested in Decatur, Georgia, where he gave the name "James L. Jefferson." When [Armstead] was interviewed on [10 April 2008], *the parties stipulated that [Armstead] stated: "I already looked up the case. Why am I not just*

*charged with conspiracy, what about the other three?"    The charging documents at that time did not mention conspiracy.  Also, Detective Lloyd testified that he had never told [Armstead] about a conspiracy charge or that there were three other people involved in the crime.*

Detective Lloyd testified that he was aware that DNA evidence had been collected at the crime scene, *but the parties stipulated that all of that evidence came back as being consistent with the victim's DNA.  Latent fingerprints recovered from the crime scene were also consistent with being from the victim.    Additionally, a search warrant was obtained for [Armstead]'s home and nothing was recovered from that search relating to this investigation.*

The State's last witness was the medical examiner, Dr. Theodore King.  According to Dr. King, Paige died of multiple gunshot wounds, and the manner of death was homicide.  He could not pinpoint the exact time of death.

After the State rested, defense counsel called Fulton.  Fulton testified that he knew [Armstead] and that he knew him by the name of "Muggs." Fulton used to live at 500 East 43rd Street in Baltimore City, "[u]p to prior to [his] arrest" in 2007.  Paige, who Fulton knew as "Poppy," lived next door at 502 East 43rd Street.  Fulton also knew Woods, Woods's son, Ricky, and Simon, also known as "Lurch."  Fulton stated that he was originally charged with Paige's murder.

Fulton testified that, on [18 March 2007], Trendon Washington called and asked Fulton to drive him to the "vial store."  Trendon Washington sold drugs, including crack and marijuana, and usually stored his drugs in a vacant house located nearby at 508 East 43rd Street.  Fulton, along with [Armstead], accompanied Washington to the store to buy vials so he could package his drugs.

When they returned, Fulton parked in front of 508 East 43rd Street while Washington went inside.  Moments later, Washington emerged and angrily informed them that his drugs were missing and that the back door to that location had been knocked down.  Recalling that Paige was outside when the three of them left to go to the "vial store," Washington and [Armstead] then went to Paige's home, while Fulton remained with his car.

Trendon Washington engaged Paige in a conversation, but Fulton could not hear what they were saying.  After that conversation, Washington and [Armstead] returned to Fulton's car, and Washington said, "I'm going to go do that."  Fulton understood this to mean that Washington was going to beat and then kill Paige.

Fulton testified that he saw Trendon Washington the next day, but he did not mention Paige or the drugs.  Fulton then saw Trendon Washington again, on [20 March 2007], at around noon or 1:00 p.m., and Fulton asked him where Paige was because he had not seen him in two days.  Washington

5

replied, "I done what I said I was going to do." Fulton understood this to mean that Washington had killed Paige. Around 5:00 or 6:00 p.m. that same day, Fulton learned that Paige was dead.

Fulton further testified that he had seen Trendon Washington carry a .45 caliber semi-automatic handgun on prior occasions, including in January and February of 2007. Fulton described the gun, and then identified State's Exhibit 6A as Trendon Washington's gun.

On cross-examination by the State, Fulton confirmed that he was not present at the time of the murder[]and, further, that Trendon Washington did not provide him with any details of what he had done. Nor did Washington tell Fulton if he was with anyone at the time of the murder.

(Emphasis added).

Armstead was charged with "conspiracy to commit murder, murder, use of a handgun in the commission of a felony and crime of violence, and wearing, carrying and transporting a handgun." *Armstead*, 195 Md. App. at 604, 7 A.3d at 172. His jury trial lasted from 25 March 2009 to 2 April 2009. During *voir dire* on the first day, the judge queried the venire as follows:[3]

Now I'm going to assume that many of you watch way too much television including those so-called realistic crime shows like Law and Order and CSI New York and CSI Miami and CSI Glenn Burnie and the rest of them. I trust you understand that these crime shows are fantasy and fiction and for dramatic effect to entertain you they claim to rely upon 'scientific evidence' to convict people.

This is certainly acceptable as entertainment but you must not allow your entertainment to interfere with your solemn duties as a juror. Therefore, if you are currently of the view that you cannot convict the defendant without 'scientific evidence' regardless of all of the other evidence in the case and

---

[3] This question was asked at the request of the State:
THE COURT: Okay. I've got one more that I might. One of my questions was I was going to give my CSI question if you wanted it and you've asked for it in your number [seven].
[APPELLANT]: Yes, sir.
THE COURT: So I'm going to give that.

6

regardless of the instruction that I give you as the law, please stand. *All right, I see no responses.*

(Emphasis added).

Armstead's trial counsel did not object to this question. The empaneled jury convicted Armstead of conspiracy to commit first-degree murder and second-degree murder. The court sentenced him to life imprisonment, plus a consecutive thirty years.

Armstead filed numerous post-trial motions, all of which the trial court denied. Armstead asserted five questions for review in his direct appeal.[4] We affirmed Armstead's conviction in 2010. The Court of Appeals denied his petition for *writ of certiorari* in 2011.

On 1 July 2014, Armstead filed a petition for post-conviction relief, calling-out his trial counsel as ineffective for failing to object to the circuit court's posing of the CSI *voir dire* question. As he perceived the query, it deprived him of his Sixth Amendment right[5] and his right under Article 21 of the Maryland Declaration of Rights.[6]

The circuit court held a hearing on Armstead's post-conviction petition on 6 January 2016.[7] The post-conviction court granted Armstead's petition and awarded a new trial. The court held, in relevant part:

---

[4] No question raised in *Armstead v. State*, 195 Md. App. 599, 605-9, 7 A.3d 169, 172-5 (2010), *cert. denied*, 418 Md. 191, 13 A.3d 798 (2011), is relevant to the present proceeding.

[5] The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right is applicable to the states through the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 343, 83 S. Ct. 792 (1963).

[6] Article 21 of the Maryland Declaration of Rights declares: "That in all criminal prosecutions, every man hath a right to . . . be allowed counsel[.]" *Taylor v. State*, 428 Md. 386, 399 n. 8, 51 A.3d 655, 662 n. 8 (2012).

[7] Although no transcript of the post-conviction hearing has been provided to this

Although trial counsel is not required to object to every possible trial judge error, trial counsel is ineffective for failing to object to rulings where there is a reasonable probability of success during an appeal . . . the question propounded in [Armstead's] case, was inherently . . . prejudicial . . . Thus, the trial counsel rendered ineffective assistance of counsel by failing to preserve the issue for appeal because there is a reasonable probability that [Armstead] would have succeeded on appeal had trial counsel objected on the grounds that the question prejudiced the *voir dire* panel . . . [Armstead's] first allegation of error [] is sufficient to grant a new trial.

## Analysis

### I.  Ineffective Assistance of Counsel.

a.  *Appellant's Arguments.*

Appellant avers that the post-conviction court granted erroneously Armstead a new trial.  In support of its ambition, the State contends that, under *Strickland*, Armstead failed to overcome the presumption that his trial counsel's inaction in not objecting to the CSI *voir dire* question was strategic.  Armstead called neither his trial counsel nor any other attorney during his post-conviction hearing as a witness to testify whether his trial counsel's election not to object to the CSI *voir dire* question deviated grievously from sound professional judgment.

Furthermore, there was, at the time of the 25 March 2009 *voir dire*, no reported Maryland jurisprudence suggesting the impropriety of such a CSI *voir dire* question.  Rather, the common law (such as it was at the time) favored such a *voir dire* question.  Trial

---

Court, the parties stipulate that Armstead "testified at the [post-conviction] hearing in support of his petition, but he did not make any remarks regarding the CSI *voir dire* question."  Trial counsel was unable to attend the hearing, but Armstead elected to proceed without her testimony.  Moreover, he failed to present "any other attorney, as a witness to testify with respect to the propriety of trial counsel's deliberate decision not to object to the *voir dire* question."

counsel was not expected to possess foresight to anticipate the subsequent change in the law limiting substantially the situations in which a CSI *voir dire* question or jury instruction may be appropriate. Appellant finds error also in the post-conviction court's conclusion that, had trial counsel objected to the CSI *voir dire* question, "Armstead stood 'a reasonable probability' of obtaining appellate reversal of his convictions." The State maintains "that there was no evidence before the post-conviction court that Armstead's direct appeal counsel . . . would have . . . [raised] a challenge to the CSI *voir dire* question had that claim been preserved for appellate review."

### b. *Appellee's Arguments.*

Armstead responds that his trial counsel's failure to object to the court's deployment of the CSI *voir dire* question was "not sound trial strategy because she knew that there was no scientific evidence linking [him] to the crime, and that the very notion served as the substantial basis of the defense theory of innocence." Trial counsel's failure to object "could not have been the result of reasonable professional judgment because it allowed the court to suggest to the jury that the lack of any scientific evidence [connecting him to the crime] could be ignored." The inherent prejudicial nature of the court's CSI *voir dire* question, notably the court's use of the word "convict," rendered it untenable. This suggested to the potential jurors that convicting Armstead was a foregone conclusion.

Further, Armstead contends that he should benefit in this case from the state of the law regarding the proper use of CSI instructions and *voir dire* questions that came into existence following his trial, i.e., the later-decided case law should apply retrospectively. Specially, Armstead maintains that *Allen v. State*, 204 Md. App. 701, 42 A.3d 708 (2012),

9

approves the retrospective application of *Stabb v. State*, 423 Md. 454, 31 A.3d 922 (2011), *Atkins v. State*, 421 Md. 434, 26 A.3d 979 (2011), and *Charles & Drake v. State*, 414 Md. 726, 733, 997 A.2d 154, 158 (2010), to our analysis of his trial counsel's inaction, as was the view taken by the post-conviction court. *Allen* countenances retrospective application, as this argument goes, because *Stabb* and *Atkins* did not "create new constitutionally based principles[,] but applied settled federal and state constitutional guarantees to new factual situations."

   c.  *The Strickland Standard.*

The federal Sixth Amendment and Article 21 of the Maryland Declaration of Rights guarantee all criminal defendants the right to the assistance of counsel. *Duvall v. State*, 399 Md. 210, 220-21, 923 A.2d 81, 88 (2007) (quoting *Strickland*, 466 U.S. at 686, 104 S. Ct. 2052) (quotation marks omitted). Within both constitutional standards nests the right to *effective* assistance of counsel. *See id*. (emphasis added). *Taylor v. State* explains *Strickland's* application when evaluating counsel's effectiveness:

> The defendant who claims that he or she received ineffective assistance of counsel, as a general rule under the test announced in *Strickland* and followed ever since, must make two showings: [(1)], the defendant must show that counsel's performance was deficient [the performance factor] [; and (2)], the defendant must show that the deficient performance prejudiced the defense [the prejudice factor].

428 Md. 386, 399-400, 51 A.3d 655, 662 (2012). Thus, "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Strickland* 466 U.S. at 698, 104 S. Ct. at 2070. It is clear that:

> [t]he standard of review of the [trial] court's determinations regarding issues of effective assistance of counsel is a mixed question of law and fact. We

10

will not disturb the factual findings of the post-conviction court unless they are clearly erroneous. But, a reviewing court must make an independent analysis to determine the ultimate mixed question of law and fact, namely, was there a violation of a constitutional right as claimed. In other words, the appellate court must exercise its own independent judgment as to the reasonableness of counsel's conduct and the prejudice, if any . . . . [The appellate court] will evaluate anew the findings of the [trial] court as to the reasonableness of counsel's conduct and the prejudice suffered. As a question of whether a constitutional right has been violated, we make our own independent analysis by reviewing the law and applying it to the facts of the case.

*State v. Sanmartin Prado*, 448 Md. 664, 679, 141 A.3d 99, 108 (2016) (*quoting State v. Jones*, 138 Md. App. 178, 209, 771 A.2d 407, 425 (2001), *aff'd*, 379 Md. 704, 843 A.2d 778 (2004)). *Newton v. State* noted recently, however, that:

> *Strickland* also instructs that courts need not consider the performance prong and the prejudice prong in order, nor do they need to address both prongs in every case. As [*Strickland*] explained, [i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.[8]

455 Md. 341, 356, 168 A.3d 1, 9 (2017), *cert. docketed*, No. 17-6478 (U.S., 26 Oct. 2017),

(Internal quotations and citations omitted).

---

[8] *Strickland* explained that:
> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

466 U.S. at 696-97, 104 S. Ct. at 2069.

11

Regarding *Strickland's* performance factor,

[t]he defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment . . . [T]he defendant must [also] demonstrate that counsel's alleged acts or omissions, based on the facts of the particular case, viewed as of the time of counsel's conduct, fell outside the wide range of professionally competent assistance.

*Sanmartin Prado*, 448 Md. at 681-82, 141 A.3d at 109 (quoting *Strickland* 466 U.S. at 687, 690, 104 S. Ct. at 2052) (quotation marks omitted).

Prevailing professional norms define what constitutes reasonably effective assistance, and all of the circumstances surrounding counsel's performance must be considered. Because it is tempting for both a defendant and a court to second-guess a counsel's conduct after conviction, courts must be highly deferential when they scrutinize counsel's performance. Reviewing courts must thus assume, until proven otherwise, that counsel's conduct fell within a broad range of reasonable professional judgment, and that counsel's conduct derived not from error but from trial strategy.

*Mosley v. State*, 378 Md. 548, 557-558, 836 A.2d 678, 683 (2003) (citations and quotation marks omitted); *see also Harris v. State*, 303 Md. 685, 697, 496 A.2d 1074, 1080, (1985) (explaining that to show deficient performance by counsel the defendant must "overcome the presumption that . . . the challenged action might be considered sound trial strategy" (citing *Strickland*, 466 U.S. at 686-688, 104 S. Ct. at 2064-66)). The soundness of trial strategy is examined typically in the contexts of investigation, preparation, and compliance with professional norms. *State v. Borchardt*, 396 Md. 586, 604, 914 A.2d 1126, 1136 (2007) (noting that "[b]efore deciding to act, or not to act, counsel must make a rational and informed decision on strategy and tactics based upon adequate investigation and preparation.").

12

First, we consider whether trial counsel violated Armstead's right to effective assistance of counsel when she failed penultimately to object to the circuit court's CSI *voir dire* question, failing ultimately to preserve the issue for appellate review on direct appeal (and perhaps as well in this collateral proceeding).

i. *The CSI Voir Dire Question.*

The Sixth Amendment and Article 21 of the Maryland Declaration of Rights grant to criminal defendants not only the right to effective assistance of counsel, but also "the right to a fair trial, which includes a requirement that trial judges refrain from making statements that may influence improperly the jury." *Stabb*, 423 Md. at 463, 31 A.3d at 927.[9] Thus, "a defendant has the right to be tried by a fair and impartial jury, Md. Dec. of Rts. Art. 21, and the "'jury is the exclusive judge of the fact[s].'" *Atkins*, 421 Md. at 443, 26 A.3d at 983 (quoting *Gore v. State*, 309 Md. 203, 210, 522 A.2d 1338, 1341 (1987) (citing Md. Dec. of Rts. Art. 23)). In that continuum, trial judges occupy an authoritative position, such that they:

> should be exceedingly careful in any remarks made by [them] during the progress of a trial [including *voir dire*], either in passing upon evidence or ruling upon prayers, and should carefully refrain, either directly or indirectly, from giving expression to an opinion upon the existence or not of any fact, which should be left to the finding of the jury . . . .

---

[9] Our recital of general statements of law from appellate opinions addressing CSI effect instructions or *voir dire* questions, which were decided after 25 March 2009, should not be read by implication as agreeing with Armstead's retrospective application argument. The general principles we deploy from those cases were well-established in case law decided before 25 March 2009.

*Gore*, 309 Md. at 212, 522 A.2d at 1342 (quoting *Elmer v. State*, 239 Md. 1, 10-11, 209 A.2d 776, 782 (1965)).

*Voir dire* is critical to ensuring protection of a criminal defendant's "Sixth Amendment [and Article 21 right] to an impartial jury." *White v. State*, 374 Md. 232, 240, 821 A.2d 459, 464 (2003) (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S. Ct. 1629, 1634 (1981)) (italics omitted). Any *voir dire* question, commentary, or instruction is precluded when its effect relieves the State of "its burden of persuasion in a criminal case, i.e., its burden of proving beyond a reasonable doubt all the facts necessary to constitute the offenses." *Atkins*, 421 Md. at 443, 26 A.3d at 983 (2011) (quoting *State v. Evans*, 378 Md. 197, 207, 362 A.2d 629, 635 (1976)).

Md. Rule 4-312(d), governing the conduct of *voir dire*, states in relevant part:

(d) Examination and challenges for cause. (1) Examination. The trial judge may permit the parties to conduct an examination of qualified jurors or may conduct the examination after considering questions proposed by the parties. If the judge conducts the examination, the judge may permit the parties to supplement the examination by further inquiry or may submit to the jurors additional questions proposed by the parties. The jurors' responses to any examination shall be under oath. On request of any party, the judge shall direct the clerk to call the role of the array and to request each qualified juror to stand and be identified when called.

*Voir dire's* primary purpose is to ensure a fair and impartial jury. *Charles & Drake*, 414 Md. at 733, 997 A.2d at 158. *Voir dire* "entails examination of prospective jurors through questions propounded by the judge (or either of the parties, if allowed by the judge) to determine the existence of bias or prejudice and, literally translated, means 'to say the truth.'" *Charles & Drake*, 414 Md. at 733, 997 A.2d at 159 (internal quotation marks omitted). The trial court is charged with discerning a juror's ability to perform his or her

14

duty fairly and impartially through questioning the juror on "issues particular to the defendant's case so that biases directly related to the crime, the witnesses, or the defendant may be uncovered." *State v. Logan*, 394 Md. 378, 395, 906 A.2d 374, 384-85 (2006). Therefore, "the subject [of *voir dire* questions] is left largely to the sound discretion of the court in each particular case." *Moore v. State*, 412 Md. 635, 644, 989 A.2d 1150, 1155 (2010) (quoting *Corens v. State*, 185 Md. 561, 564, 45 A.2d 340, 343 (1946)). The abuse of discretion standard explains that:

> a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.

*King v. State*, 407 Md. 682, 697, 967 A.2d 790, 799 (2009). A chief concern when evaluating whether a trial judge abused his or her discretion when imparting to the venire a CSI effect "message" is whether the perception of the message relieves ultimately the State of its burden to prove the criminal defendant's guilt beyond a reasonable doubt. *Stabb*, 423 Md. at 472, 31 A.3d at 933.

A CSI effect jury message received its initial reported appellate analysis in Maryland in *Evans v. State*, 174 Md. App. 549, 922 A.2d 620 (2007), which involved a *jury instruction*. It re-surfaced next in the context of a *voir dire question* in *Drake & Charles v. State*, 186 Md. App. 570, 975 A.2d 204 (2009), *rev'd sub nom. Charles & Drake v. State*, 414 Md. 726, 997 A.2d 154 (2010). Since then, the implications of CSI effect jury

15

messages have tasked repeatedly both of our appellate courts to consider the potential for

prejudice on the minds of jurors.[10]

As relevant to this appeal, *Stabb* and *Atkins* (the present day standard-setters) make

clear, based on the "inconclusive state of the scholarly legal and/or scientific research[11]

---

[10] *Compare Hall v. State*, 437 Md. 534, 540-41, 87 A.3d 1287, 1290-91 (2014) (holding a CSI jury instruction improper, but finding the instruction harmlessly given); *Robinson v. State*, 436 Md. 560, 580, 84 A.3d 69, 81 (2014) (trial court abused its discretion in giving the "anti-CSI effect" jury instruction); *Stabb v. State*, 423 Md. 454, 472, 31 A.3d 922, 933 (2011) (the "'anti-CSI effect' jury instruction given, in the circumstances of this case, was improper"); *Atkins*, 421 Md. at 452-53, 26 A.3d at 989 (finding a CSI effect jury instruction given erroneously); *Carrero-Vasquez v. State*, 210 Md. App. 504, 63 A.3d 647 (2013) (trial court's giving of a scientific evidence instruction was improper); *Samba v. State*, 206 Md. App. 508, 534, 49 A.3d 841, 857 (2012) (same), *and Evans v. State*, 174 Md. App. 549, 570-71 922 A.2d 620, 632-33 (2007) (no error in the court's CSI jury instruction), *with State v. Stringfellow*, 425 Md. 461, 476, 42 A.3d 27, 36 (2012) (holding that asking an anti-CSI *voir dire* question was unpreserved and harmless); *Burris v. State*, 206 Md. App. 89, 136-42, 47 A.3d 635, 662-66 (2012) (noting the lower court's CSI effect *voir dire* question to be a content-neutral inquiry into the standard with which jurors would review evidence), *rev'd on other grounds*, 435 Md. 370, 78 A.3d 371 (2013); *Morris v. State*, 204 Md. App. 487, 42 A.3d 83 (2012) (the lower court's CSI *voir dire* question did not in any way "'suggest[] that finding the defendant "guilty" was a foregone conclusion[]'"); *McFadden & Miles v. State*, 197 Md. App. 238, 254, 13 A.3d 68, 77 (2011) (CSI *voir dire* question improperly given), *disapproved of by Stringfellow*, 425 Md. 461, 42 A.3d 27; *Charles & Drake v. State*, 414 Md. 726, 739, 997 A.2d 154, 162 (2010) (trial judge abused discretion when asking CSI *voir dire* question), *and Kelly v. State*, 195 Md. App. 403, 434, 6 A.3d 396, 414 (2010) (noting, in the context of a waived appellate challenge for counsel's failure to object to a CSI *voir dire* question, "the record as a whole does not lead to the conclusion that the jurors were under the impression that convicting appellant was the only option.").

[11] The current state of scholarly research regarding the so-called "CSI effect" in litigation contexts remains inconclusive regarding the effect's authenticity. *Robinson*, 436 Md. at 79-81, 84 A.3d at 578-80, explicated that "in the last two years since [the Court of Appeals] issued *Stabb*, legal and empirical proof of the existence of a "CSI effect is still wanting." (elaborating further on the current state of CSI effect scholarly research); *see Stabb*, 423 Md. at 467-71, 31 A.3d at 930-32 (the Court discusses, at length, the "'CSI Effect' Redux"); *Atkins*, 421 Md. at 457-62, 26 A.3d at 993-96 (Harrell, J., concurring) (engaging in a thorough analysis of the CSI Effect scholarly research legal landscape);

16

taken as a whole," that Maryland disapproves of preemptive anti-CSI messages to the venire or the empaneled jury. *Stabb*, 423 Md. at 473, 31 A.3d at 933 (to the extent that such an instruction is requested, its use ought to be confined to situations where it responds to correct pre-existing overreaches by the defense, i.e., a curative instruction. The Court of Appeals may revisit the appropriateness of CSI messages when tailoring an "appropriate response through *voir dire* questions and/or jury instruction" when a demonstration of scholarly research has become more abundant); *State v. Stringfellow*, 425 Md. 461, 473-74 n. 4, 42 A.3d 27, 34-35 n. 4 (2012) ("*Stabb* and *Atkins* discuss when it may be permissible for courts to *pose a voir dire question* or a jury instruction to counter what has been referred to popularly as the 'anti-CSI effect.' Suffice it to say; these cases hold that it is erroneous to pose such a question or instruction as a pre-emptive measure." (emphasis added)). There must be, at minimum, some form of relevant misstatement(s) of law or conduct by counsel for the court to issue an appropriate and curative CSI effect jury instruction or similar anticipatory grounds to ask a *voir dire* question. *See Hall v. State*, 437 Md. 534, 540-41, 87 A.3d 1287, 1290-91 (2014). Moreover, counsel's mere reference to, or argument regarding (or announced intent to argue), the absence or insufficiency of the State's scientific evidence to meet its burden of proof to convict a criminal defendant does not warrant automatically the court's issuance of a CSI message. *See Robinson v. State*, 436 Md. 560, 580, 84 A.3d 69, 81 (2014).

---

*Charles & Drake*, 414 Md. at 731-33, 997 A.2d at 157-59 (analyzing the scholarly basis regarding the impact that viewing forensic crime dramas has upon juror behavior).

17

*Stabb*, "with a [clairvoyant] nod to the future," noted that there might be situations where CSI effect messages may be appropriate. *Stabb*, 423 Md. at 473, 31 A.3d at 933. When those situations arise, the message must be neutral, i.e., the message must not convey to the jury that their only option is to *convict*, even if no forensic evidence linking the defendant to the crime(s) is adduced by the State. The message should (at least) include language indicating that a not guilty verdict is an alternative. *See Charles & Drake*, 414 Md. at 738, 997 A.2d at 161 (noting the language of the *voir dire* question was not neutral, "using the term 'convict,' solely, rather than including its alternative"); *Samba v. State*, 206 Md. App. 508, 534, 49 A.3d 841, 857 (2012) ("the anti-CSI effect instruction was fatally flawed for not advising the jury to *consider the lack of forensic* evidence in evaluating reasonable doubt").

The question before us requires consideration of the status of the law at the time of Armstead's trial, and that which evolved to the contrary afterwards. After doing so, we find no dilemma holding in this case that trial counsel's performance was not deficient for failing to object to the CSI *voir dire* question. There was no legal signpost alerting trial counsel to the possibly inappropriate nature of this CSI effect *voir dire* question.

ii. *The Direction The Legal Winds Were Blowing in 2009 Regarding a CSI Effect Voir Dire Question.*

Armstead concedes that at the time of his jury trial, "the current body of case law regarding this 'CSI instruction' had not yet arrived." In fact, there was little case law existing at the time of Armstead's trial regarding CSI effect *voir dire* questions. Trial counsel may be imputed reasonably to know only of the *Evans* opinion from this Court,

18

filed two years earlier, discussing a defense counsel's objection to a CSI effect *jury instruction*, which instruction was suggested to be proper.

Evans was convicted of possession-related heroin charges. *Evans*, 174 Md. App. at 552, 922 A.2d at 622. Evans' conviction was based on the eyewitness testimony from an undercover police officer who was conducting an undercover narcotics purchase. *Evans*, 174 Md. App. at 555, 922 A.2d at 624. At trial, the judge, noting an objection from a co-defendant's counsel,[12] charged the jury:

> During this trial, you have heard testimony of witnesses and may hear argument of counsel that the State did not utilize a specific investigative technique or scientific tests. You may consider these facts in deciding whether the State has met its burden of proof. You should consider all of the evidence or lack of evidence in deciding whether a defendant is guilty. *However, I instruct you that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case.* Your responsibility as jurors is to determine whether the State has proven, based on the evidence, the defendants' guilt beyond a reasonable doubt.

*Evans*, 174 Md. App. at 570-71, 922 A.2d at 632-33 (emphasis added). Considering the sufficiency of the evidence, we explained that the argued absence from the State's case of forensic evidence, i.e., photographic or video evidence of the heroin transaction, was not material. *See Evans*, 174 Md. App. at 570-71, 922 A.2d at 633. Although the introduction

---

[12] Evans was arrested with a co-defendant, Antwon Peaks. Evans and Peaks were tried jointly. Peaks objected to the aforementioned instruction, noting that '[he had] not previously seen this instruction given in the Circuit Court for Baltimore City. . . .' The objection, duly noted by the court, was overruled." *Evans*, 174 Md. App. at 564, 922 A.2d at 629. Evans, however, failed to object to the CSI effect jury instruction. We held "[Evan's] failure to raise such issue in the trial court precludes us from such consideration on [direct] appeal." *Evans*, 174 Md. App. at 566, 922 A.2d at 630. We proceeded, nevertheless, to analyze the appropriateness of the CSI effect jury instruction as an alternative basis for affirmance of the convictions.

19

of such evidence would have "made the discharge of the jury's duty easier," it was, at the end of the day, unnecessary for the State in meeting its burden through the evidence it did adduce. *Id.* Moreover, we indicated that the instruction was "a correct statement of the law, was applicable to the facts in the case and was not fairly covered by other instructions given[,]" and the "robust and vehement closing arguments of counsel . . . warranted [further] giving the instruction." *Evans*, 174 Md. App. at 570, 922 A.2d at 632.

As the parties note correctly in their briefs, there was *no law* on CSI effect *voir dire* questions existing at the time of Armstead's trial. The only arguable basis that trial counsel might have had imputable notice of the possible impropriety of such a *voir dire* question would have been *Drake & Charles*, 186 Md. App. 570, 975 A.2d 204 (decision filed on 7 July 2009). When we considered *Drake & Charles*, the briefs, however, were not filed until 7 April 2009 and 7 May 2009, respectively, after Armstead's trial concluded. In any event, our decision in *Drake & Charles* would have provided no basis for Armstead's counsel to think there was a basis to object. Thus, there was no apparent indicator to Armstead's trial counsel that the law might be tacking in a different direction than *Evans*.[13] It is unreasonable to expect trial counsel to foresee the change that remained beyond the horizon.

### iii. *What Changed in the Post-2009 Law?*

The legal analysis of *CSI* effect *voir dire* questions and instructions took a sharp turn from *Evans* beginning with the Court of Appeals's decision in *Charles & Drake v.*

---

[13] *See Armstead*, 195 Md. App. 599, 7 A.3d 169 (Armstead's brief was filed on 25 March 2010 and the State's response was filed on 18 May 2010).

*State* (a direct appeal case), which reversed our 2009 decision in *Drake & Charles v. State*.

In *Charles & Drake v. State*, *over the defendant's objection*, the trial judge propounded the

following CSI effect question to the prospective jurors during *voir dire*:

> I'm going to assume that many of you, from having done a few of these, watch way too much TV, including the so-called realistic crime shows like CSI and Law and Order.  I trust that you understand that these crime shows are fiction and fantasy and are done for dramatic effect and for this dramatic effect they purport to rely upon, 'scientific evidence,' to convict guilty persons.  While this is certainly acceptable as entertainment you must not allow this entertainment experience to interfere with your duties as a juror. Therefore, if you are currently of the opinion or belief that you *cannot convict* a defendant without 'scientific evidence,' regardless of the other evidence in the case and regardless of the instructions that I will give you as to the law, please rise.

*Charles & Drake*, 414 Md. at 730, 997 A.2d at 156-57 (emphasis added).  The Court of

Appeals found that the propounded *voir dire* question "suggested that the jury's only option

was to convict, regardless of whether scientific evidence was adduced." *Charles & Drake*,

414 Md. at 737, 997 A.2d at 161.  The Court concluded that the defendants were entitled

to a new trial because the language used—the word "convict" especially—poisoned the

venire, compelling them to believe their only option was to convict. *Id.*

Four months later, in *Kelly v. State* (also a direct appeal), we considered a situation

where a trial judge, *without objection from the defense trial counsel*, asked the prospective

venire a question nearly identical to the one administered in *Charles & Drake*:

> Now, I'm going to assume, having done this a few times, that many of you watch way too much television, including those so-called realistic crime shows like CSI: New York and CSI: Miami and CSI: Glen Burnie and Law and Order and the rest of it.  And I trust that you understand that these crime shows are fiction and fantasy and for your entertainment.  And for dramatic effect, they purport to rely upon 'scientific evidence' to convict guilty persons.

> While this is certainly acceptable as entertainment, you must not allow your entertainment to interfere with your duties as a juror. Therefore, if you are currently of the opinion that you cannot convict a defendant without 'scientific evidence,' regardless of all of the other evidence in the case and regardless of the instructions that I give you as to the law of the case, please stand.

195 Md. App. 403, 429, 6 A.3d 396, 411 (2010), *cert. denied* 417 Md. 502, 10 A.3d 1181 (2011) (emphasis added). We held ultimately the issue unpreserved for review because of counsel's failure to object. *Kelly*, 195 Md. App. at 434, 6 A.3d at 414 (2010). We commented, however, that the record "as a whole does not lead to the conclusion that the jurors were under the impression that convicting [Kelly] was the only option." *Id.* We remarked that "[T]he [trial] court repeatedly told the jury, in both *voir dire* and during instructions, that they must return a verdict of not guilty if the State did not prove [Kelly's] guilt beyond a reasonable doubt." *Id.*

In *McFadden & Miles* (yet another direct appeal), a trial judge asked, *over defense counsel's objection*, the venire during *voir dire*:

> I'm going to assume, based on having done this before, that many of you watch way too much television, including the so-called realistic crime shows, like CSI, Miami, and CSI, New York, and CSI, Glen Burnie, Law and Order, and Illegal and Unwarranted and the rest of them.
>
> Now, I trust you understand that these crime shows are fiction and fantasy. And for dramatic effect and for you to stay tuned in, they purport to rely upon 'scientific evidence.' This is certainly entertainment, but you must not allow that entertainment to interfere with the high duty you will have in this case as a juror.
>
> Therefore, if you are currently of the opinion or belief that you *cannot convict* a Defendant without 'scientific evidence,' regardless of the other evidence in the case and regardless of the instruction I give you as to law, please rise. I see no responses. Okay.

22

197 Md. App. 238, 250-51, 13 A.3d 68, 75 (2011) (emphasis added). With *Charles & Drake* finding a similar query inappropriate, our unavoidable conclusion was that McFadden and Miles were "deprived of a fair and impartial jury" because the judge abused his discretion by suggesting to the panel that "convicting [McFadden and Miles] was the only option." *McFadden & Miles*, 197 Md. App. at 254, 13 A.3d at 77 (quoting *Charles & Drake*, 414 Md. at 739, 997 A.2d at 156-57).

The year 2012 saw a trinity of reported cases issue from our State appellate courts regarding CSI effect *voir dire* questions. In *Stringfellow*, another direct appeal, the trial court put to the venire the following query, "[d]oes any member of the panel believe that the State is required to utilize specific investigative or scientific techniques such as fingerprint examination for the defendant to be found guilty beyond a reasonable doubt?" *Stringfellow*, 425 Md. at 466, 42 A.3d at 30. Defense counsel objected; however, he thereafter accepted the jury panel without exception, thus "fail[ing] to preserve [the propriety of the question] for appellate review." *Stringfellow*, 425 Md. at 469, 42 A.3d at 32. The Court noted, "had Stringfellow preserved his objection, and assuming that propounding the pre-emptive 'anti-CSI effect' question was error, the error was harmless beyond a reasonable doubt, given the record of his trial." *Id.*

In *Morris v. State*, involving another direct appeal, the trial court, during *voir dire*, issued, *over defense objection,* the following question to the venire:

> Ladies and gentlemen, televisions shows such as C.S.I., Crossing Jordan and some of the like are fiction. They are not true. Many of the scientific methods used in those kinds of television shows are exaggerated or do not even exist. If you are selected as a juror in this case[,] you will be required

23

> to base your decisions solely on the evidence presented in court. Would any potential juror be unable to ignore the so called crime dramas they have been seeing on television, the movies and [i]nternet or such and putting that aside in making your decision based solely on the evidence that you hear in court and not through some expectation of something that you've seen through the media or television? Is there anyone who would be so persuaded by such a show that they would not be able to judge this case fairly and impartially? Please rise if that applies to you. Let the record reflect that there is no such response.

204 Md. App. 487, 490, 42 A.3d 83, 85 (2012). We held this *voir dire* question "did not in any way suggest that finding the defendant guilty was a foregone conclusion or fail to lay out any alternative." *Morris*, 204 Md. App. at 496, 42 A.3d at 88 (internal quotation marks omitted). We noted that this question did not suffer from the same flaws as that administered in *Charles & Drake*. *Id.* Notably, the question omitted the "convict" reference, utilized neutral language otherwise, and asked the venire whether they would be capable of putting aside any pre-established expectations generated from television and render a "decision based solely on the evidence" admitted in court. *Morris*, 204 Md. App. at 490, 796-97, 42 A.3d at 85, 88-9.

In *Burris v. State*,[14] our most recent reported opinion assessing CSI *voir dire* questions (again in a direct appeal context), the trial court asked, *with no objection from defense counsel*:

> Within this world of, of science or circumstantial evidence is the world of scientific evidence and within that world there is now what is referred to as

---

[14] The Court of Appeals, although reversing our judgment in *Burris v. State*, 435 Md. 370, 78 A.3d 371 (2013), did so because "defendant's gang membership was relevant to the alleged murder for purposes of determining admissibility of expert testimony identifying defendant as a member of a notorious gang, but the probative value of expert testimony was substantially outweighed by the danger of unfair prejudice." The Court did not comment critically on this Court's analysis of the CSI effect *voir dire* question.

crime scene investigation type of evidence. The type of evidence that's been dramatized in the television programs, the Hannibal Lecter books and movies that deal with trace evidence. Trace evidence being hair and fingerprints and DNA and one book fingerprints on an eyeball. These are dramatizations of forms of circumstantial evidence. *The jurors will be called upon to consider all of the evidence that is presented no matter who it is presented by.* No matter what the person, the party is urging you to consider. Is there any member of the jury panel who would require trace evidence in order to accept a proposition presented by one of the parties? In other words, you say well, she didn't present this or he didn't present that. I can't accept it. Is there any member of the jury panel who set that form of artificial standard?

206 Md. App. 89, 107, 47 A.3d 635, 645 (2012) (emphasis added). We noted, at the outset, that the question was unpreserved for review because Burris "failed to object to the "CSI-type" *voir dire* question and accepted the jury empaneled. *Burris*, 206 Md. App. at 140-41, 47 A.3d at 665 (2012). Nonetheless, we explained that the circuit court asked a reasonable, content-neutral and appropriate *voir dire* question. *See Burris*, 206 Md. App. at 141, 47 A.3d at 665.

iv. *So, What Now?*

It has long been established that an attorney is not required ordinarily to be prescient as to changes in the law and act accordingly. *See Maryland v. Kulbicki*, 136 S. Ct. 2, 4 (2015) (per curiam); *Unger v. State*, 427 Md. 383, 409, 48 A.3d 242, 257 (2012). Armstead presented no evidence establishing that the prevailing professional norm at the time of his trial was to object to CSI effect messages to the venire or jury. We do not find deficient trial counsel's decision to forgo objecting to the trial court's CSI *voir dire* question in this case. The fact that some attorneys, around the State or in Baltimore City, were objecting

25

apparently to such questions at trials held at, about, or before, the time of Armstead's trial[15] and others were not[16] is an insufficient predicate on which to hold that Armstead's trial counsel had any rational basis to make such an objection and, thus, she was performing below an objective standard of reasonableness when she did not object.

What Armstead misunderstands, in his application of the *Strickland* performance standard to the failure of his trial counsel to object to the trial court's CSI *voir dire* question, is that he had the burden to prove his trial counsel "made errors so serious that [she] was not functioning as the counsel guaranteed . . . by the Sixth Amendment [and the Maryland Declaration of Rights]." *Sanmartin Prado*, 448 Md. at 681-82, 141 A.3d at 109 (quoting *Strickland*, 466 U.S. at 687, 690, 104 S. Ct. at 2052) (quotation marks omitted). Armstead was the sole witness at his post-conviction hearing, but failed to remark on the CSI *voir dire* question. Armstead's trial counsel was unable to testify at the post-conviction hearing because she was ill, but, rather than seek a continuance, Armstead elected to continue without her testimony. Armstead opted also to proceed without testimony from any other

---

[15] Brief for Appellant, at 1, *Drake & Charles v. State*, 186 Md. App. 570, 975 A.2d 204 (2009), *rev'd sub nom. Charles & Drake v. State*, 414 Md. 726, 997 A.2d 154 (2010) (No. 3021), 2009 WL 1348786 at 3 (defense counsel objecting during May 2006 trial to CSI voir dire question); *McFadden & Miles* v. State, 197 Md. App. at 250, 13 A.3d at 75 (trial counsel objecting to the CSI voir dire question during *voir dire* on 21 October 2008).

[16] Brief for Appellant, at 1, *Kelly*, 195 Md. App. 403, 6 A.3d 396, (No. 645), 2010 WL 3415327, at 1-2 (defense counsel did not object to the CSI effect *voir dire* question during 27-30 April 2009 trial); *Handy v. Bishop*, CV RDB-14-1820, 2015 WL 9259258, at *8 (D. Md. Dec. 18, 2015) (defense counsel alleged (in a federal *habeas* action ) ineffective for failing to object to the trial judge's (same trial judge as here) CSI effect *voir dire* question during May 2008 state trial).

attorney or witness as to the unreasonableness of his trial counsel's failure to object to the circuit court's issuance of the CSI effect *voir dire* question.

We "must assume, until proven otherwise, that counsel's conduct fell within a broad range of reasonable professional judg[]ment, and that counsel's conduct derived not from error but from trial strategy." *Sanmartin Prado*, 448 Md. at 679, 141 A.3d at 108 (quoting *Jones*, 138 Md. App. at 209, 771 A.2d at 425). In our view, Armstead failed, on this record, to meet this burden.

To overcome these failings, Armstead demands the benefit of *Charles & Drake* (2010) and *McFadden & Miles* (2011); that is, their holdings and reasoning should apply retrospectively to the ineffective counsel analysis in his post-conviction case, based on *Allen*, 204 Md. App. 701, 42 A.3d 708. We disagree. First, Armstead's reliance on *Allen* is misplaced. We held in *Allen* that *Atkins* and *Stabb* would apply retrospectively to then pending direct appeal cases where objections preserved a challenge. *See Allen*, 204 Md. App. at 721-22, 42 A.3d at 720-21. Further, *Atkins* and *Stabb* considered CSI *jury instructions*, not *voir dire* questions. *Allen*, 204 Md. App. at 703, 42 A.3d at 710. *Voir dire* questions and jury instructions serve distinct purposes and occur usually at opposite ends of the trial process. Jury instructions "aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict." *Appraicio v. State*, 431 Md. 42, 51, 63 A.3d 599, 604 (2013) (quotation omitted). *Voir dire* seeks to "uncover any bias that a venire[-]person might harbor. To achieve that result, to be able to do so, any proposed question related to the facts of the case, designed

27

to uncover such bias, is directed to a specific cause for disqualification and, therefore, must be asked." *Moore*, 412 Md. at 650, 989 A.2d at 1158.

Moreover, the potential for lingering impact of an arguably inappropriate *voir dire* question at the beginning of trial, although such a question may keep a responding venire person favorable to the defendant from serving, is of concern because it may plant invasive species' seeds in the minds of non-responding venire persons who end-up being empaneled. As to the latter, whether the argued prejudice of *voir dire* questioning carries through in undiluted strength to the jury deliberation process is debatable. Evaluation of prejudice turns ordinarily on a contextual consideration of individual trial records. On the other hand, jury instructions given on the cusp of deliberations are arguably more likely to be retained by and impress the jury in deliberation because of the close proximity in time.

Armstead's present case is a 2014-16 post-conviction challenge, not a direct appeal from his 2009 conviction. Moreover, the critical issue, as noted above, is unpreserved for our review. Armstead's current case fails each predicate of *Allen's* analysis to support retrospective application of the relevant post-2009 case law. Moreover, Armstead's reasoning overlooks *Kelly*, which, if applied retrospectively, would work a likely detriment to Armstead's objective. The post-conviction court, therefore, applied erroneously *Charles & Drake v. State* to the present case, thus misapplying ultimately the *Strickland* standard. Trial counsel's performance in 2009 was not ineffective for failing to object to the trial judge's CSI effect *voir dire* question.

Even were we to assume, for the moment, that Armstead's invocation of Maryland's post-2009 reported, direct appeal jurisprudence regarding a trial court's use of CSI effect

28

*voir dire* questions (or instructions) were applicable here, we find no prejudice (the other component of *Strickland*) on this record. Therefore, the error (if any), was harmless.

d. *Harmless Error.*

As to *Strickland's* prejudice factor, a post-conviction petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Sanmartin Prado*, 448 Md. at 681-82, 141 A.3d at 109-10 (citing *Strickland* 466 U.S. at 687, 690, 104 S. Ct. at 2052). An "analysis of prejudice . . . should not focus solely on an outcome determination, but should consider 'whether the result of the proceeding was fundamentally unfair or unreliable.'" *Coleman v. State*, 434 Md. 320, 341, 75 A.3d 916, 928 (2013) (citing *Oken v. State*, 343 Md. 256, 284, 681 A.2d 30, 44 (1996) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S. Ct. 838, 842 (1993))). In the context of a trial counsel's failure to preserve an issue for appeal, "*Strickland's* performance and prejudice [factors] naturally overlap because the questions of whether counsel's performance was adequate and whether it prejudiced the [asserting party] both will turn on . . . whether there is a reasonable possibility of success." *Gross v. State*, 371 Md. 334, 350, 809 A.2d 627, 636 (2002). A counsel's ineffectiveness for failing to preserve an issue for appellate review "necessarily requires a reviewing court to look at the merits of the underlying claim." *Id.*

When a trial court injects erroneously a CSI effect *voir dire* question, in order for a court to find harmless error, the court must be satisfied beyond a reasonable doubt that the abuse of discretion was harmless. *Hall*, 437 Md. at 540, 87 A.3d at 1291; *Stringfellow*, 425 Md. at 474, 42 A.3d at 35. We must, "upon an independent review of the record, '"be

29

satisfied that there is no reasonable possibility"' that the assumed error caused impermissibly the guilty verdict." *Stringfellow*, 425 Md. at 474, 42 A.3d at 35 (citing *Lee v. State*, 405 Md. 148, 163, 950 A.2d 125, 134 (2008) (quoting *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976))).

The record must demonstrate that the reference to a lack of scientific evidence was not material to the contested issue. *Compare Hall*, 437 Md. at 540, 87 A.3d at 1291 (in an armed carjacking case, the Court held a CSI effect jury instruction regarding the lack of scientific evidence, i.e., a photograph of the defendant controlling the victim's car, was not material or necessary to "shed any light" on how the defendant gained control of the victim's car), *and Evans*, 174 Md. App. at 570, 922 at 632-33 (the lack of scientific evidence was not critically important to the case; the State could prove guilt beyond a reasonable doubt with an eyewitness's testimony and identification by two detectives involved directly in the transaction), *with Atkins*, 421 Md. at 50, 26 A.3d at 988 (the missing scientific evidence was critically important to the case, i.e., "[t]he evidence lacking here could have been direct evidence to affirmatively linking the knife introduced to the alleged assaults.").

Factors relevant in determining whether an erroneous CSI effect *voir dire* question was given harmlessly include, but are not limited to: the timing and content of the CSI *voir dire* question, *see Morris*, 204 Md. at 490, 796-97, 42 A.3d at 85, 88-9, whether the erroneously given question was "reiterated during jury instruction or other comments from the bench while the jury was present;" the presence of alleviating jury instructions or "follow-on instruction/*voir dire* question"; whether the State or defense stressed the

importance of the CSI effect *voir dire* question in trial, and whether the judge allowed the parties an unrestrained chance to argue the adequacy or inadequacy of scientific evidence necessary to his or her defense. *See Stringfellow*, 425 Md. at 474-77, 42 A.3d at 34-6; *Kelly*, 195 Md. App. at 434, n. 18, 6 A.3d at 414, n. 18.

In *Stringfellow*, the Court found that the circuit court's CSI *voir dire* question was given harmlessly.[17]  In reaching that decision, the Court noted:

> the error was not reiterated during jury instructions or other comments from the bench while the jury was present.  While the error occurred during an important part of the trial process, the judge's management of closing argument ameliorated significantly any prejudice to Stringfellow.  The judge permitted Stringfellow's attorney to make a closing argument, over the State's objection, about how the police officers' failure to request testing of the confiscated handgun for latent fingerprints created reasonable doubt . . . The failure to request a fingerprint analysis became, in defense counsel's words, "a big issue" . . .  Thus, the judge's management of closing argument defused any prejudicial impact of the erroneously propounded *voir dire* question.

*Stringfellow*, 425 Md. at 474-75, 42 A.3d at 35.  Moreover, *Stringfellow* gave weight (albeit less than other factors) to the lower court's jury instruction restating the State's burden of proof. *Id.*  The Court observed that:

> toward the end of trial, the judge admonished the jury during his final instructions, 'I may have commented on evidence or asked a question of a witness. You should not draw any inferences or conclusions from my

_____

[17] The Court held ultimately that "Stringfellow . . . waived his objection to the [CSI effect] *voir dire* question." *Stringfellow*, 425 Md. at 473-74, 42 A.3d at 34.  The Court, however, assumed, for the sake of argument, that had Stringfellow preserved the issue for its review, "and that it was error for the trial judge to pose the pertinent question [(the question was given preemptively)], [the] result here would be the same because we are persuaded that there is no reasonable possibility that the erroneously propounded voir dire question contributed to the guilty verdict, i.e., asking the question was harmless error on this record." *Stringfellow*, 425 Md. at 474, 42 A.3d at 34 (internal citations and footnote omitted).

comments or questions either as to the merits of the case or as to my views regarding the witness . . . the State had the constant burden to prove that Stringfellow was guilty beyond a reasonable doubt and that if you are not satisfied of the defendant's guilt to that extent, then reasonable doubt exists and the defendant must be found not guilty.'

*Stringfellow*, 425 Md. at 476, 42 A.3d at 36. *Stringfellow* perceived that the lower court's

follow-up jury instructions, although carrying less weight in the analysis of the error's

harmlessness,[18] assisted nonetheless in applying salve on the sting of the erroneous CSI

effect *voir dire* question. *Stringfellow*, 425 Md. at 475, 42 A.3d at 35 (citing *Alston v.*

*State*, 414 Md. 92, 108, 994 A.2d 896, 905 (2010)). Harmless error was found principally

because, among other things, the CSI effect *voir dire* question was given

contemporaneously with follow-on instructions and the pronouncement of final remedial

instructions. *Stringfellow*, 425 Md. at 476-77, 42 A.3d at 36. Moreover, the circuit court

allowed Stringfellow's counsel to criticize the absence of scientific evidence from the

State's case, which (in the defense's mind) was necessary in order to convict Stringfellow.

*Stringfellow*, 425 Md. at 474-75, 42 A.3d at 35. This was paramount in the harmless error

analysis. *Stringfellow*, 425 Md. at 477, 42 A.3d at 36.

In Armstead's case, the *voir dire* question is nearly identical to the question posed

in *Charles & Drake*, *Kelly*, and *McFadden & Miles*. The problematic language in the *voir*

*dire* questions was "if you are currently of the view that you cannot *convict* the defendant

---

[18] *Stringfellow* conceded that curative instructions not given contemporaneously with the commission of the error are potentially of diminished curative value. *Stringfellow*, 425 Md. at 475, 42 A.3d at 35 (citing *Donaldson v. State*, 416 Md. 467, 499, 7 A.3d 84, 103 (2010)). Further, general jury instructions tend to "have relatively attenuated curative effect." *Id.*

without 'scientific evidence' regardless of all the other evidence in the case and regardless of the instruction I give you as to the law, please stand." (emphasis added). *Charles & Drake*, *Kelly*, and *McFadden & Miles* noted the potential for prejudice inherent in the use of the word "convict" in the heart of the query. The words preceding and following "convict" suggest to the jury that a conviction is their only option. *Hall*, *Robinson*, *Stabb*, and *Atkins* note the inconclusive empirical proof of the existence of a CSI effect and whether it affects adversely the work of a jury,[19] but indicate that an anti-CSI effect message may be appropriate if tailored "to situations where it responds to correction of a pre-existing overreach by the defense, i.e., a curative instruction." *Robinson*, 436 Md. 577, 84 A.3d at 79 (quoting *Stabb*, 423 Md. at 472-73, 31 A.3d at 933).

Had Armstead noted an objection to the trial judge's *voir* dire question and/or assuming the post-2009 relevant case law is applicable properly to find error here, we do not believe that the trial judge's administration of the question merits a new trial. We agree with Appellant that, employing *Stringfellow's* and *Kelly's* rationales, the trial court's CSI effect *voir dire* query was harmless on the record of Armstead's trial.

---

[19] As noted earlier, the parties point-out correctly that the case law at the time of Armstead's trial mitigated in favor of the appropriateness of such CSI questions. *See Drake & Charles*, 186 Md. App. 570, 975 A.2d 204; *Evans*, 174 Md. App 549, 922 A.2d 620. Although after *Charles & Drake* and *McFadden & Miles* the landscape changed, the later cases note still the abundant curative opportunities the judge has to rectify the question's prejudicial consequence throughout the trial. *See Stringfellow*, 425 Md. at 476, 42 A.3d at 36; *Burris*, 206 Md. App. at 136-42, 47 A.3d at 662-66; *Morris*, 204 Md. App. 487, 42 A.3d 83; *Kelly*, 195 Md. App. at 434, 6 A.3d at 414.

*Stringfellow* and *Kelly* persuade us that the circumstances surrounding the trial court's assumedly erroneous *voir dire* question here did not cause Armstead any resultant prejudice. In other words, we conclude that the question did not cause impermissibly the guilty verdict. In reaching this conclusion, we look, contextually, at the "the cumulative effect of all errors on the ability of a jury to render a fair and impartial verdict in the context of the case." *Donaldson v. State*, 416 Md. 467, 497, 7 A.3d 84, 101 (2010) (quoting *Lawson v. State*, 389 Md. 570, 604-05, 886 A.2d 876, 896 (2005)).

Neither the trial court nor the parties' counsels repeated the anti-CSI effect message (as such) during the trial. Moreover, the trial judge, after a seven-day jury trial and at the close of all the evidence, instructed correctly the jury as follows:

> The instructions I give you are binding upon you . . . You will have, and I will pass them out . . . a verdict sheet. . . . A verdict is either *guilty or not guilty* . . . Each verdict that you render must be the considered judgment of each of you . . . Now, this defendant and every defendant is *presumed to be innocent of all of the charges*. This presumption remains with him throughout every stage of the trial and *is not overcome unless you are convinced beyond a reasonable doubt that he is guilty. The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This burden remains with the State throughout trial* . . . However, if you are not satisfied of the defendant's guilt to that extent, then reasonable doubt exists and the defendant must be found not guilty

>           \*         \*         \*

> During the trial, if I commented on the evidence, I don't know that I did, or asked a question of a witness, do not draw any inferences or conclusions from any comment I may have made or question, either as to my view as to the merits of the case or to my views regarding the witness.

>           \*         \*         \*

The court repeated the State's burden of proof later in its jury instructions:

34

> Now, the burden is on the State to prove beyond a reasonable doubt that the offense was committed and that the defendant was the person who committed it.

These instructions, like those in *Stringfellow*, "assisted in dislodging any residual bits of potential prejudice concerning the weight of presented (or unpresented) evidence and reminded the jury of the State's fixed burden of proof." *Stringfellow*, 425 Md. at 476, 42 A.3d 36. Jury instructions at the close of the evidence, containing correct statements of law, following a potentially erroneous CSI *voir dire* question delivered at the beginning of a 7-day trial, have a heightened curative potency because they are the last thing the jury hears before deliberating. *See id.*[20]

Further, the trial court afforded counsel broad exuberance in arguing during closing the absence or insufficiency of scientific evidence linking Armstead to Ricardo Paige's murder. Defense counsel argued:

> What evidence, beyond the very less than credible Leroy Simon, does the State have? Zip. Detective Lloyd, Officer Carl Page, Technician Teresa Havrilla, walked through that crime scene and none of them saw anything that pointed to Kevin Armstead as the perpetrator. Dr. Theodore King did an autopsy. He said on the average it's about three hours to do one of those. There was nothing in the autopsy that pointed to Kevin Armstead as the one who murdered Ricardo Paige. Technician Havrilla lifted some suitable prints, and they were examined by Loraine Lansey of the latent print unit,

---

[20] In addition, at the beginning of *voir dire*, the trial judge advised the prospective jurors that Armstead is "presumed to be innocent" and "remains innocent unless the State convince[s] twelve jurors unanimously beyond a reasonable doubt." As was the situation in *Kelly*, this is relevant in our determination that the assumedly erroneous question resulted in harmless error. 195 Md. App. at 434, 6 A.3d at 414 (noting that "although the wording of the specific *voir dire* question was improper, the record as a whole does not lead to the conclusion that the jurors were under the impression that convicting appellant was the only option. The court *repeatedly told the jury, in both voir dire and during instructions, that they must return a verdict of not guilty if the State did not prove appellant's guilt beyond a reasonable doubt*." (emphasis added)).

35

and you can see that in defendant's exhibit 9, it's Teresa Gavrilla's run sheet . . . . Nothing they found pointed to Kevin Armstead.

The police searched [Armstead's] home and found nothing connecting [Armstead] to the murder. The gun, the gun that was used to kill Ricardo Paige was found on Trendon Washington just weeks after the murder of Ricardo Paige . . . . And then as I told you the DNA. The DNA that was found belonged to Ricardo Paige, not Kevin Armstead. There is nothing that connects Kevin Armstead to the murder of Ricardo Paige.

In response, the prosecution countered, in his rebuttal closing argument:[21]

[Armstead's trial counsel] brings up an interesting point about the DNA. She talks about the DNA that's there. It's all Mr. Paige's. When [the crime scene technicians] checked [Paige's] fingernails it was his own DNA. But if you're in a tussle and I'm Mr. Paige and I'm being struck and I reach out, I grab clothing, I'm not necessarily going to grab skin cells or anything like that . . . .

[t]here are two explanations [for] the injuries on [Paige's] lip and to his face. [There are two reasons for this]. One, terminal collapse, two, being punched in the face and being punched in the mouth. What happens when you punch somebody in the mouth and you hit their teeth or you punch them in the face and you draw blood? You get their DNA on you. But why don't we have . . . [Paige's] DNA from [Armstead's] hands? . . . He ran, he ran away. He ran to Georgia. DNA and all, Mr. Paige's DNA on his, he's gone. That's the DNA that we should be worried about, not the DNA that was under Mr. Paige's skin. The DNA that was on his fist when he pounded on [Paige], when [Fulton, Twin, Armstead, and an unidentified fourth person] committed this vicious murder.

It is apparent counsel were allowed amplitude in arguing their positions as to the adequacy or inadequacy of the scientific evidence admitted (or not). Such latitude ameliorated further any prejudice the assumedly erroneous CSI *voir dire* question may have planted in the minds of the venire that was empaneled. The trial court allowed

---

[21] Unlike in *Stringfellow*, the State here did not object to the defense's argument.

Armstead to assert his innocence due to the absence of DNA evidence linking Armstead to Paige's murder.

Armstead continues, however, that he was "highly prejudiced by the *voir dire* question because the question invaded the fact-finding province of the jury to weigh the evidence as presented." We disagree. The absence of scientific evidence linking Armstead to the murder was not critical to the State's establishment, beyond a reasonable doubt, of Armstead's involvement in the death of Ricardo Paige. In reaching this view, we find the reasoning in *Evans* (noted earlier) and *Atkins* persuasive.[22]

In *Atkins*, the Court reached a different result than *Evans*. Atkins was convicted of second-degree assault because he threatened the victim (in alleged self-defense) using a pocketknife. *Atkins*, 421 Md. at 439, 26 A.3d at 981. In the execution by the police of a search warrant for Atkins' home, they located a "non-foldable black knife, approximately 12[-]inches in length." *Id.* The police did not "perform any scientific or forensic testing on the knife[,] and there was no testimonial evidence from witnesses linking the particular knife found in Atkins' home to the crime." *Id.* After the close of the evidence, the court gave an anti-CSI effect *jury instruction*,[23] over defense counsel's objection, which the

---

[22] *Evans* and *Atkins* addressed the viability of anti-CSI effect jury instructions. We view in this *voir dire* question case their analyses convincing to the extent the CSI *voir dire* question was thought to excuse Appellant's need to prove its case beyond a reasonable doubt, despite the absent scientific evidence.

[23] The circuit court instructed the jury as follows:

During this trial, you have heard testimony of witnesses and may hear argument of counsel that the State did not utilize a specific investigative technique or scientific test. You may consider these facts in deciding whether the State has met its burden of proof. You should consider all of the evidence or lack of evidence in deciding whether the defendant is guilty.

Court found to be improper. *Atkins*, 421 Md. at 441-42, 26 A.3d at 982-83 (emphasis added).

In holding improper the anti-CSI effect instruction,[24] the Court of Appeals reasoned that "the knife used was of *critical importance* in the case, considering its size and character, and the defense sought to discredit the alleged connection between the knife found at Atkins's home and the crime." *Atkins*, 421 Md. at 450, 26 A.3d at 988 (emphasis added). Had the missing scientific evidence been offered, it was supposed that it "could have been direct evidence to [linking affirmatively] the knife introduced to the alleged assaults." *Id.*

Here, Armstead asserted that there was no scientific evidence, e.g., DNA, linking him to Paige's death. The absence of DNA evidence was unnecessary, however, for the State to convince a reasonable jury, beyond a reasonable doubt, to convict, considering the evidence adduced actually.

Armstead was arrested in Georgia (where he had been living under the alias "James L. Jefferson" for the two weeks after the police discovered Paige's body). It was unlikely at that point in time that DNA evidence of Paige would be located on Armstead's person. Moreover, Leroy Simon (a testifying eyewitness) observed Armstead, Fulton, one of the

---

However, I instruct you that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case.
*Atkins*, 421 Md. at 441-42, 26 A.3d at 982-83.

[24] The instruction given in *Atkins* was improper because it "effectively relieved the State of its burden. [] [T]he instruction did not clearly explain to the jury the relation between the fact that the State was not required to produce specific evidence on the one hand, with the continuing obligation of the State to prove the defendant's guilt beyond a reasonable doubt on the other hand." *Atkins*, 421 Md. at 455, 26 A.3d at 991.

twin Washington brothers (Twin), and a fourth unidentified individual outside of Paige's home on the night of Paige's death. Simon saw Armstead and Twin subsequently break-and-enter Paige's home. Fulton and the fourth unidentified individual stayed outside to give the other two directions. Simon heard "tussling" from inside the house, several gunshots, and then watched Armstead and Twin emerge from Paige's home.

As in *Evans* where the supposed non-existent evidence, i.e., pictures or videos of the heroin transaction, might have bolstered the eyewitness account, but was deemed cumulative, the circumstances of the present case are similar. The recovery of any DNA placing Armstead at the scene would have bolstered Simon's testimony, but would have been cumulative and thus not essential in the State's overall case. *See Branch v. State*, 305 Md. 177, 183–84, 502 A.2d 496, 499 (1986) (explaining why a single eyewitness identification is sufficient to permit a jury to find guilt beyond a reasonable doubt).

Perhaps the strongest evidence linking Armstead to the death of Ricardo Paige was Armstead's statement made to Detective Lloyd during Armstead's pre-trial interrogation. Detective Lloyd testified, and the parties stipulated, that Armstead stated, "I already looked up the case. Why am I not just charged with conspiracy, what about the other three?" The charging documents at that time did not mention conspiracy. Detective Lloyd testified further that, before Armstead made this statement, he had not told Armstead about the conspiracy charge or that there were three other people known by the police to be involved in the crime. Armstead's statement was both voluntary and inculpatory. Had there been available DNA evidence corroborating further Armstead's participation in the crime, it would have been merely another layer on the already-baked cake.

In conclusion, even if the trial judge's administration of its CSI effect *voir dire* question was an abuse of his discretion, we are satisfied beyond a reasonable doubt that the supposed prejudice of the question was harmless. Had Armstead's counsel preserved the CSI *voir dire* question for appeal, Armstead would not have had a reasonable probability of success under *Strickland's* prejudice factor.

Armstead had a high hurdle to surpass under *Strickland*, which he failed to clear. We reverse the post-conviction court's judgment granting Armstead a new trial.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED WITH INSTRUCTIONS TO DENY APPELLEE'S POST-CONVICTION PETITION; COSTS TO BE PAID BY APPELLEE.**